**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DEREK WATSON and
DAWN WATSON,

                Plaintiffs,                      CASE NO.  05-CV-74043
                                                  PAUL D. BORMAN
-vs-                                          UNITED STATES DISTRICT JUDGE

FELIX TREVINO, et al.,

                Defendants.
_____/

### ORDER AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

      Before the Court are the following Motions for Summary Judgment: (1) Defendants

Rhind and Colosky (Docket No. 51); (2) Defendant Bonadurer (Docket No. 71); and (3)

Defendants Cook, Rust, Salter, and Urban (Docket No. 72). The Court held a motion hearing on

November 22, 2006. For the following reasons, the Court GRANTS IN PART and DENIES IN

PART Defendants' Motions for Summary Judgment.

**I.      BACKGROUND**

      **A.     Plaintiffs' Factual Allegations**

      Plaintiffs Derek and Dawn Watson's ("Plaintiffs") 42 U.S.C. § 1983 excessive force

claim arises out of a search warrant execution by members of the Flint Area Narcotics Group

("FANG") on January 14, 2003. At the time of the raid, FANG consisted of police officers from

the Michigan State Police and various law enforcement agencies throughout Genesee County.

      On January 14, 2003, FANG police officers awakened Plaintiffs by breaking down

1

Plaintiffs' front door and storming into their house. (Compl. ¶ 6). The police officers never knocked or announced their presence, nor did they ever indicate that they were at Plaintiffs' residence to execute a search warrant for illegal drugs. (Compl. ¶ 7). Officer Christopher Rhind pointed a drawn gun at Dawn Watson and yelled, "Get down, motherf***er!" (Compl. ¶ 8). Officer Rhind put his foot on Dawn Watson's buttocks, pointed a gun at her head, told her he had a search warrant, and asked her where the dope was. Dawn Watson responded that she did not what he was talking about. (Compl. ¶ 9). Other officers entered Plaintiffs' baby's room with their guns drawn and snatched the baby from his crib. (Compl. ¶ 10).

Plaintiff Derek Wilson then entered the main part of the residence from the basement, where he had been sleeping. (Compl. ¶ 11). When the police officers yelled at Plaintiff, he dropped to his knees and put his hands over his head. (Compl. ¶ 12). The officers continued to yell at Plaintiff, "Get down you stupid motherf***er, where's the drugs?" Plaintiff responded that he did not know what they were talking about. (Compl. ¶ 13). The officers attempted to kick Plaintiff while he had his hands in the air to get him down on the ground. (Compl. ¶ 14). While Plaintiff was still on his knees and with his hands still in the air, one of the officers struck Plaintiff in the back of the head with a blunt object stating, "Get down you stupid motherf***er, where's the drugs?" (Compl. ¶ 15). Plaintiff then curled into a fetal position, at which time Defendant police officers continued to beat and kick him. (Compl. ¶ 16). Defendant police officers then handcuffed Plaintiff and pepper sprayed his eyes. (Compl. ¶ 17).

After the police officers brought in drug-sniffing dogs, the officers presented the search warrant to Plaintiffs. (Compl. ¶ 18). In obtaining the warrant, the police officers had wrongly acted upon a tip from a confidential informant that Plaintiffs had several blocks of cocaine in

their residence. (Compl. ¶ 19). The police officers never independently verified the statements of the confidential informant nor conducted any surveillance of Plaintiffs' residence prior to the execution of the search warrant. (Compl. ¶ 20). The police officers did not locate any cocaine, but found only insignificant amounts of marijuana belonging to Plaintiff Derek Watson's brother, who resided in Plaintiffs' basement. (Compl. ¶¶ 24-26). Furthermore, Plaintiffs allege that as a result of a complaint that they filed against the police officers, an internal investigation revealed that certain officers lied in the warrant affidavits in an effort to obtain probable cause to enter Plaintiffs' residence. (Compl. ¶ 27).

### B.    Defendants' Characterization of the Facts

On January 14, 2003, Officer Felix Trevino received information from a confidential informant, during a "ride-around" in a police car, that s/he had observed cocaine in the kitchen of Plaintiffs' home.

From his vehicle, Officer Trevino then contacted Officer Don Urban and relayed the information so that Urban could prepare an affidavit for a search warrant. Officer Christopher Rhind, a police officer with the Grand Blanc Police Department, was also in the vehicle with Officer Trevino, but did not take part in relaying the information or obtaining the search warrant. Officer Trevino also provided Officer Urban with information on the confidential informant's reliability and credibility, which Officer Urban relied upon in obtaining a search warrant. Officer Urban then contacted an assistant prosecuting attorney to draft a search warrant. A judge in the 67th district court reviewed and authorized the warrant.

However, the day after the execution of the search warrant, it was determined that the information in Paragraph 10 was inaccurate. (Defs. Br. 3, Ex. E, Affidavit and Application for a

3

Search Warrant). Paragraph 10 stated that the confidential informant knew the substance in

Plaintiffs' residence was cocaine and the s/he knew it to be cocaine because s/he had used a

portion from Plaintiffs' block. Officer Trevino admitted that Paragraph 10 should not have been

included and was a result of a miscommunication between Officers Trevino and Urban.

However, Defendants contend that the remainder of the Affidavit provided sufficient probable

cause for the warrant.

At approximately 10:45 p.m. on the night of January 14, 2003, the FANG office held a

raid briefing. Officers Rhind and Steven Colosky were responsible for preparing the majority of

the written plan, including the handling of large dogs known to be on Plaintiffs' premises.

Officer Colosky, from the City of Flushing Police Department, was assigned to secure any

occupants of the home upon entry.

Prior to the raid, the officers conducted a drive-by of Plaintiffs' residence, and the house

appeared dark. At approximately 11:35 p.m., the FANG officers approached Plaintiffs' residence

and announced the search warrant over the loudspeaker of the police patrol vehicle. Pursuant to

the plan, Officer Rhind, responsible for handling the dogs known to be on Plaintiffs' property,

knocked on the front door, identified himself as "police, search warrant," and then forced entry

into the house. Once inside, Officer Rhind encountered Plaintiff Dawn Watson and ordered her

to the ground. She complied with the order. While detaining Dawn Watson and watching for the

dogs, Officer Rhind learned that Plaintiffs' dogs were outside.

As other FANG officers entered the premises, Officers Colosky and Scott Rust

encountered Plaintiff Derek Watson. Both identified themselves as police officers with a search

warrant and then ordered Plaintiff to the ground. Plaintiff initially went to this knees but refused

4

to lay in a prone position. As Officer Colosky attempted to grab Plaintiff and put him in a prone

position, Plaintiff began resisting and flailing his arms in an aggressive manner. Observing

Plaintiff's resistance, Officer Rust began assisting Officer Colosky when all three fell to the

floor. Once on the floor, Plaintiff continued to resist and would not comply with officers' verbal

commands to loosen his hands to be cuffed. After repeated requests and warnings that pepper

spray would be used, Officer Rust sprayed Plaintiff with pepper spray. Moments later, Plaintiff

complied and was handcuffed without further incident. Officer Kevin Salter, who had been near

the bedrooms, returned to assist Officers Colosky and Rust and also helped handcuff Plaintiff at

this point. Defendants contend that at no point was Plaintiff struck with an object or kicked.

However, Officer Rust did attempt to use a pressure point technique, including behind the ear

and a mandible angle move.

Officer Tim Cook was a member of the entry team but was assigned to search the

bedrooms and bathrooms for suspects. He also assisted in searching the rooms after all of the

occupants of the residence were secured. Officer Cook did not have any contact with Plaintiffs.

Officers Troy Bonadurer and Trevino also entered Plaintiffs' residence at some point after

Officers Colosky and Rust. Officer Bonadurer's job was to cover Officer Trevino from the front

door to past the dining room. Officer Bonadurer did not have any contact with Plaintiffs.

After the pepper spray was used, Officer Rhind allowed Dawn Watson to retrieve her

baby from the bedroom. All other persons were removed from the residence while the house

aired out. Detective Tom Cremonte, who had remained outside during the execution of the

search warrant, escorted Dawn Watson to retrieve her baby. Once outside, an ambulance was

called to check Derek Watson for a head laceration and for a negative reaction to the chemical

spray. Derek Watson refused treatment and signed a medical waiver witnessed by two FANG officers.

Following the initial entry into the home, the officers searched Plaintiffs' residence and discovered a single marijuana plant, a baggy containing several marijuana roaches, and a heat lamp. While questioning the suspects, Anthony Watson, Derek Watson's brother, admitted that the marijuana was his. Plaintiff Derek Watson denied any knowledge of the marijuana.

### C.    Procedural

On May 17, 2005, Plaintiffs filed their second amended complaint in Genesee County Circuit Court against municipal and individual defendants, including Defendants Felix Trevino, Don Urban, Troy Bonadurer, and Kevin Salter.[1] Plaintiff made the following claims:

I.      Assault and Battery
II.     False Arrest and False Imprisonment
III.    Gross Negligence

Plaintiff could have, but did not include federal claims in that complaint.

While the state case was still pending in Genesee County, Plaintiff filed a federal suit on August 30, 2005, claiming § 1983 excessive force, against the following Defendants also named in the pending state case: (1) Felix Trevino, (2) Don Urban, (3) Troy Bonadurer, and (4) Kevin Salter. Plaintiffs named four additional Defendants not named in the second amended state complaint: (5) Steven Colosky, (6) Tim Cook, (7) Christopher Rhind, and (8) Scott Rust. The heading in the federal Complaint clearly stated, "There is no other pending or resolved civil action rising out of the transaction or occurrence alleged in the Complaint." *Watson v. Trevino*,

---

[1] In the Second Amended Complaint in state court, Plaintiffs also named the following additional Defendants: (1) Genesee County, (2) Gary Parsons, (3) Jeff Antcliff, (4) Tom Cremonte, (5) Rick Kane, and (6) Certain Other Unidentified Officers.

No. 05-73350 (E.D. Mich. Sept. 12, 2005). Counsel for Plaintiffs admitted at the motion hearing on November 22, 2006, that there was a pending state case when this statement was made to the Court. (Tr. 7).

At that point in time, due to Plaintiffs' misleading statement on the heading of the Complaint, the Court was unaware that Plaintiffs had a related, ongoing state case arising out of the same incident. As a result, the Court allowed a voluntary dismissal of the federal case on September 12, 2005, apparently since Plaintiffs preferred, at that point, to pursue the state case. As will be noted below, when Plaintiffs did not receive some successful rulings in the state case, they came back to federal court.

Although the state and federal cases involved the same set of facts and the same pool of defendants, at no point did Plaintiffs move to amend the state court complaint to include the additional Defendants Colosky, Cook, Rhind, and Rust. Furthermore, Plaintiffs never sought to amend the state court complaint to include the § 1983 excessive force claim.

On October 21, 2005, Plaintiffs filed a nearly identical federal Complaint as the one dismissed on September 12, 2005, asserting a § 1983 excessive force claim against the same Defendants named in the first federal Complaint, with the exception of Rick Kane.[2] The second

---

[2] Plaintiffs' second federal Complaint only includes one Count, § 1983 excessive force. Although Plaintiffs seem to imply throughout the case that they also have a § 1983 illegal search claim, it is not stated in the Complaint, nor did Plaintiffs ever move to amend the federal Complaint to include this possible claim. The Court inquired about this at the summary judgment motion hearing, and the parties agreed that the only claim in front of the Court was excessive force:

> The Court:     Let me ask a couple questions here. In the Complaint in this case, which it turns out is the second Complaint filed in federal court, if you turn – the pages aren't numbered. It would be helpful if in the future they would be numbered, but let's turn to the second from last page. Okay. It says violation of the Fourth Amendment, 42 U.S.C. Section 1983 excessive

Complaint omitted the heading "There is no other pending or resolved civil action rising out of the transaction or occurrence alleged in the Complaint," contained in the first Complaint.

On April 10, 2006, the state court granted summary disposition to Defendant Bonadurer on all of Plaintiffs' claims against him. On April 26, 2006, the state court dismissed the claims of assault & battery and false arrest against Defendant Trevino. Plaintiffs filed an appeal of the state court decision on May 17, 2006, on the issue of the dismissal the two claims against Defendant Trevino. On May 26, 2006, the parties stipulated to a voluntary dismissal without prejudice of the claims against Defendants Urban and Salter. On July 3, 2006, the parties stipulated to a voluntary dismissal without prejudice of the remaining claims of false imprisonment and gross negligence against Defendant Trevino. On July 14, 2006, the state court dismissed the remainder of Plaintiffs' claims. *See Watson v. Genesee County*, No. 04-80209-CZ (Genesee County Cir. Ct. July 14, 2006). On August 16, 2006, the Michigan Court of Appeals dismissed as untimely Plaintiffs' appeal of summary disposition to Defendant Trevino on the two counts. *Watson v. Genesee County*, No. 270536 (Mich. Ct. App. Aug. 16, 2006).

---

|              | force. So as I read this, and it seems as though we are proceeding on a claim with excessive force in violation of the Constitution. Is that correct? |
| Mr. Prebay:  | That is correct, Your Honor. |
| The Court:   | Okay. Is that correct? Anyone? So we're dealing with an excessive force claim, period. Okay. Then I have read all the facts in terms of the entry and the allegation both by Mr. Watson and Mrs. Watson relating to the excessive force claims. This then roots out the search claims but deals with excessive force upon their entry into the house and their actions against individuals. So that's clear. |

(Tr. 6:8-25).

8

The following summarizes the relevant dates between the federal and state cases.

Additionally, all of the depositions taken in this case contain the state court case caption, and not

the federal caption.[3]

| | | |
|---|---|---|
| **(1)** | **May 17, 2005:** | **Second Amended State Complaint** |
| (2) | August 10, 2005: | Depositions of Felix Trevino & Jeff Antcliff |
| **(3)** | **August 30, 2005:** | **First Federal Complaint** |
| **(4)** | **September 12, 2005:** | **Voluntary Dismissal of First Federal Complaint** |
| (5) | September 13, 2005: | Depositions of Tim Cook & Steven Colosky |
| (6) | September 15, 2005: | Depositions of DeClercq, Christopher Rhind, and Don Urban |
| (7) | October 10, 2005: | Depositions of Troy Bonadurer, Rick Kane, Scott Rust, and Kevin Salter |
| **(8)** | **October 21, 2005:** | **Second Federal Complaint** |
| (9) | October 28, 2005: | Depositions of Lieutenant Cremonte & Brian Warden |
| (10) | November 4, 2005: | Defendants' Deposition of Plaintiff Dawn Watson |
| (11) | November 4, 2005: | Defendants' Deposition of Plaintiff Derek Watson |
| (12) | November 16, 2005: | Deposition of Detective Corona |
| (13) | April 10, 2006: | Dismissal of Bonadurer on all claims in state case |
| (14) | April 26, 2006: | Dismissal of Trevino from the state case on the assault & battery and false arrest claims |
| (15) | May 17, 2006: | Plaintiffs appeal state court dismissal of assault & battery and false arrest as to Defendant Trevino |
| (16) | May 26, 2006: | Voluntary Dismissal of Defendants Urban and Salter from state case on all claims |
| (17) | July 3, 2006: | Voluntary Dismissal of Defendant Trevino from state case on remaining claims of false imprisonment and gross negligence |
| (18) | July 14, 2006: | Final disposition of state case in circuit court |
| (19) | August 16, 2006: | Michigan Court of Appeals issues order denying appeal as to Defendant Trevino as untimely |
| (20) | November 22, 2006: | Summary Judgment hearing on Second Federal Complaint |

Defendants Colosky and Rhind filed their Motion for Summary Judgment on June 19,

2006. (Docket No. 51). Defendant Bonadurer filed his Motion for Summary Judgment on August

---

[3] Both of Plaintiffs' federal Complaints also named the following Defendants that were dismissed before summary judgment stage of the second federal case: (1) Brian Warden, (2) Tom Cremonte, (3) Ryan Pennell, and (4) Jeff Antcliff. Defendant Rick Kane was named as a Defendant in the both the second amended state complaint and the first federal complaint but was not included in the second federal complaint.

30, 2006. (Docket No. 71). Defendants Cook, Rust, Salter, and Urban filed their Motion for

Summary Judgment on September 1, 2006. (Docket No. 72).

The Court issued an Order on October 25, 2006, requesting that the parties submit

supplemental briefs addressing the issue of the possible preclusive effects of the state court

disposition on the instant federal case. (Docket No. 81). Defendant Bonadurer argued that the

state court's grant of summary disposition to him on the state law claims should preclude

Plaintiffs' relitigation of the same issues in federal court. Remaining Defendants submitted that

they did not believe that the state court action had any preclusive effect because (1) Officers

Salter, Trevino, and Urban were dismissed voluntarily without prejudice in the state court and

(2) Officers Colosky, Cook, Rhind, and Rust were never named as Defendants in the state court

action. Plaintiffs submit that they made clear in their depositions of witnesses and defendants

that they were only discussing issues pertaining to the state and not the federal case.[4]

## II.     ANALYSIS

### A.     Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim,

counterclaim, or cross-claim is asserted may "at any time, move with or without supporting

---

[4] The only depositions that Plaintiffs produced in support of their argument that the depositions
only related to the state claims are those of Defendants Colosky and Urban. (Pl. Resp. Mot.
Protective Order, Ex. A). Plaintiffs also requested during discovery in the federal case that they
be allowed to redepose the state court Defendants, as well as newly-named Defendants on the
federal claims, since they claim that the previous depositions of these individuals were limited to
the state claims. This Court denied that motion, finding that Plaintiffs, through reasonable
diligence, should have been aware of the potential federal claims since both the state and federal
claims arose out of the same set of facts involving the same individuals. The Plaintiffs could
have amended their state complaint to include the new defendants and new claims, since the
Michigan law has long recognized that its state courts can entertain federal § 1983 actions.
Instead of bringing their entire case in either state or federal court, Plaintiffs chose to file a
parallel federal suit involving the same facts and parties. (Docket No. 88).

affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### B.       Preclusion of § 1983 Excessive Force Claim Against Defendant Bonadurer

Defendant Bonadurer argues that Plaintiffs should be estopped from asserting a § 1983 excessive force claim since the Michigan state court granted him summary disposition on all of Plaintiffs' state law claims on April 10, 2006. Plaintiffs' brief does not address the collateral estoppel effect of the state court judgment as to Defendant Bonadurer

A federal court must give a state court judgment the same preclusive effect as would be given that judgment under the law of the forum. *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 81 (1984). Although a state court's final judgment does not preclude the federal court of jurisdiction over a federal claim arising out of the same occurrence, the doctrines of res judicata and collateral estoppel may still bar a plaintiff's claim. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292-93 (2005). Under Michigan law, the doctrine of res judicata bars a second subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first. *Adair v. State*, 470 Mich. 105, 121 (2004); *see* MCR 2.203(a) (compulsory joinder of claims). Michigan courts have adopted a broad res judicata doctrine,

12

holding that it bars every claim arising out of the same transaction that the parties, exercising reasonable diligence, could have raised but did not. *Adair*, 470 Mich. at 121. It is also well-settled in Michigan that a party can bring a § 1983 claim in state court. *Dep't of Treasury v. Campbell*, 161 Mich. App. 526, 529 (1986). Finally, a Michigan court's entry of summary disposition on a claim acts as a final adjudication on the merits. *Capital Mortgage Corp. v. Coopers & Lybrand*, 142 Mich. App. 531, 536 (1985).

Similarly, Michigan courts hold that collateral estoppel applies when a party can establish three elements: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel. *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 682-84 (2004).

The state trial court granted Defendant Bonadurer summary disposition on all claims and dismissed him from the case. The Court holds that the doctrines of res judicata and collateral estoppel bar Plaintiffs' § 1983 claim against Defendant Bonadurer. Under *Adair*, Plaintiffs had their previous state law claims against Defendant Bonadurer decided on the merits, both the federal and state actions involved the same parties, and the excessive force claim could have been resolved in the state court action. Under collateral estoppel, the Court notes that a determination on the merits that a police officer did not commit assault and battery necessarily litigates a factual issue necessary to a § 1983 excessive force claim. *See VanVourous v. Burmeister*, 262 Mich. App. 467, 479-83 (2004) (holding that, under the doctrine of collateral estoppel, a federal court's decision dismissing an excessive force claim on the merits precluded a plaintiff from relitigating a claim of assault & battery by a police officer in a subsequent state proceeding); *see also Page v. Bouchard*, No. 04-73875, 2005 WL 2290988, *4 (E.D. Mich. Sept.

13

20, 2005) (unpublished) (holding that res judicata and collateral estoppel barred the plaintiff from reasserting a § 1983 excessive force claim after the state court dismissed her assault & battery claim); *Grey v. Morris*, 95 F.3d 1152, 1996 WL 494996 (6th Cir. Aug. 29, 1996) (unpublished table opinion).Additionally, the parties had a full and fair opportunity to litigate the related factual issues in the state court proceeding.

Therefore, the Court GRANTS Defendant Bonadurer's Motion for Summary Judgment.

### C.        Section 1983 Excessive Force Claims

Defendants argue that the use of force by the police offices was reasonable and in the alternative that Defendants are entitled to qualified immunity. The Supreme Court has held that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). To determine whether an officer is entitled to qualified immunity, the court must inquire whether the facts as alleged establish that the officers (1) violated a constitutional right and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). Additionally, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202. The plaintiff has the burden of establishing both prongs to overcome qualified immunity. *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004).

Excessive force claims are evaluated under the reasonableness standard of the Fourth Amendment. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). The reasonableness of the amount of force used turns on the facts and circumstances of each case. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004). The Court must evaluate the following factors to determine whether a police officer's actions are reasonable: (1) the severity of the

14

crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or

others, (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

*Graham v. Connor*, 490 U.S. 386, 396 (1989).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chamber, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Id.* at 396-97.

In order to hold a police officer liable for excessive force under § 1983, a plaintiff must

show that the officer (1) actively participated in the use of excessive force, (2) supervised the

officer who used excessive force, or (3) owed the victim a duty of protection against the use of

excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). A police officer may be held

liable for failure to act to prevent the use of excessive force when (1) the officer observed or had

reason to know that excessive force would be or was being used and (2) the officer had both the

opportunity and the means to prevent the harm from occurring. *Id*.

### 1.     Dawn Watson – Officer Rhind

Defendant Rhind argues that the force applied to Plaintiff Dawn Watson was reasonable

given the circumstances. During the execution of the search warrant, Officer Rhind, assigned to

protect the other officers from Plaintiffs' dogs, was the first individual to enter Plaintiffs'

residence. (Dep. Rhind 40, 45). Defendant Rhind testified that he had his shotgun "in the ready

post" when he encountered Dawn Watson. (Dep. Rhind 46). He then ordered her to the ground.

(*Id.*). He also admitted that Dawn Watson was not a threat. In reference to Plaintiffs' allegations

that he put his foot in her back, he testified:

> Q:   Did you ever put a foot on her back?
> A:   No, sir.
> Q:   You say – earlier you said, as a matter of fact, no way, I didn't put a shotgun to
>      her head. Why would you say that?
> A:   She wasn't a threat. She didn't have anything in her hands. She didn't have any
>      weapons.
> Q:   You wouldn't have put your foot on her back as a matter of fact. Why?
> A:   I'm sorry, I don't believe. If I put my foot on her back, I straddled her when she
>      was on the ground. The only way I had to put my foot on the back for her safety
>      and the officers. If she tried to get up, I couldn't put my hands on her because I
>      had a shotgun in my hands.

(Dep. Rhind 46-47). Officer Rhind further stated that he had nothing to do with the officers'

physical confrontation with Plaintiff Derek Watson. (Dep. Rhind 51-55).

In their Brief, Plaintiffs stated that they did not object to the dismissal of Defendant

Rhind on the excessive force claim. However, at the motion hearing, Plaintiffs argued a claim

against Defendant Rhind for failure to stop the excessive force against Plaintiff Derek Watson.

(Tr. 25, 27). This claim was not alleged in Plaintiffs' Complaint nor contended in this case until

oral argument.

Therefore, the Court GRANTS Defendant Rhind's Motion for Summary Judgment.

2.      Derek Watson – Officers Colosky, Rust, and Salter

Plaintiff Derek Watson testified that immediately prior to the FANG search warrant

execution, he had been sleeping in a spare bedroom in his basement. (Dep. Derek Watson 56-

57). He was awoken by the sound of his dogs barking from the backyard and by his wife's

screaming. (Dep. Derek Watson 57). Plaintiff put on some sweats and then ran upstairs. (*Id.*). As

he emerged from the downstairs, he was confronted by a group of police officers telling him to

"get down" and that they had a warrant. (Dep. Derek Watson 61). Plaintiff testified that he

16

immediately dropped to his knees, with his body facing the police officers, and put his hands in the air, palms facing out. (*Id*.). The officers repeated their orders to Plaintiff to "get down." (Dep. Derek Watson 66-67). When asked why Plaintiff did not go "all the way down," Plaintiff testified that he could not have gotten down on his belly any sooner because "as soon as [he] hit [his] knees, they were on top of [him], wanted to beat on [him]." (Dep. Derek Watson 102-03).

Plaintiff testified then he saw a boot come up towards his upper body, and Plaintiff used his elbow to swipe the boot away. (Dep. Derek Watson 67-68, 106-07). After that, Plaintiff stated that he "heard wap, over the back of [his] head." (Dep. Derek Watson 67). Plaintiff claims that he suffered the head laceration as a result of this blow. (Dep. Derek Watson 68-69). After the blow to the head, Plaintiff testified:

> Q:    At some point in time you just told us you had your hands over your head like this like I'm now doing?
> A:    Yes, sir.
> Q:    Was that after you were struck in the head?
> A:    They all jumped on me, sir. After that the police just all just jumped on me.
> Q:    Okay.
> A:    Yes, and I had my hands covering my head.
> Q:    All right. The police all jumped on you. Do you have any idea how many police you're talking about at that point in time?
> A:    Sir, it would be a guess, but I'd say half a dozen. I would say six.
> Q:    So you think six police officers essentially jumped you at the same time?
> A:    Pretty much same time, yes, sir. It was like – you know, it was like – it was kicking, punching, around the neck. I mean, there was – it was like they were a swarm of wild dogs.

(Dep. Derek Watson 72). Plaintiff then stated that the officers got him to the floor in a prone position. (Dep. Derek Watson 73). Plaintiff testified that his hands were to his side and that he did not resist being handcuffed. (*Id*.).

Plaintiff then testified that while still handcuffed on the ground in a prone position, an unidentified officer approached and sprayed him with pepper spray.

17

Q:      And once you were handcuffed, what happened next?

A:      Once I was handcuffed I thought things would be over with. The things were – I was handcuffed so I though, okay. And I started – I started to turn around and I was going to ask, "Okay, now, can somebody tell me what the hell is going –" that's what I was going to ask. But I never got it out of my mouth. I got like, "What the hell –" like this. And a guy was – I could see him – you seen my sliding door in the back, the back window.

Q:      Right.

A:      The sliding door.

Q:      Your back sliding door or patio door?

A:      Yes, sir, When I turned around and looked, because I'm laying there, I could see the silhouette of a man. And he was crouched down – he was crouched down like this and he had pepper gas. And he was waiting for me to turn around and I never got it out of my mouth and he started shooting me in the eyes. And I'm already handcuffed.

.       .       .       .

Q:      How long did you receive the OC spray? Any idea? In other words, how long did it last?

A:      When I turned around like this, like I said, I was going to ask, "What in the hell is going on here?" Before I got that out of my mouth, I got to like, "What the hell. . . ." and when I turned around, he was (indicating), and, you know, you're not going to take that too long. You know what it is. So I turned around. So it couldn't have been no longer that him spraying me with a direct shot. It was coming out like a squirt – like a water gun, just p-s-s-s-s. So it couldn't have been no longer than – I'm not going to sit here and tell you. I buried my face. So it couldn't have been no longer than a second or two, I wouldn't think.

Q:      All right.

A:      And then he continued to spray it while my face was buried in the carpet. And I can tell you right now for a fact because I could feel it, he was spraying for that cut in my head to make it even more pain on me. Because I could feel it hitting me because it was coming out in that hard of a stream.

. . . .

Q:      Was it two or a continuous spray?

A:      A continuous spray.

(Dep. Derek Watson 73-74, 80-81).

Defendant Officer Colosky testified that he was the second officer into Plaintiffs' residence after Officer Salter. (Dep. Colosky 47). Officer Colosky was assigned to enter the

house and to secure any suspects. (Def. S.J. 11). After entering Plaintiffs' residence, Officer

Colosky encountered Plaintiff Derek Watson in the residence's small kitchen area. (Dep.

Colosky 56). Officer Colosky began ordering Plaintiff to get down on the ground. (Dep. Colosky

59). Plaintiff fell to his knees and stuck "his hands out in front of him in some fashion. . . .[with]

his fists clinched" (Dep. Colosky 59-60). Officer Colosky testified that he ordered Plaintiff

numerous times to lay flat on the ground, but Plaintiff did not comply. (Dep. Colosky 61).

Officer Colosky then attempted to grab a hold of Plaintiff's right arm to make Plaintiff comply

with the order. At that point, Officer Colosky stated that Plaintiff tried to take a swing at him

with his left arm but missed Officer Colosky. (Dep. Colosky 62). At some point, Detective Scott

Rust came over to assist Officer Colosky in subduing Plaintiff. (Dep. Colosky 63). Then,

Officers Colosky and Detective Rust attempted to come straight at Plaintiff, and all three fell

down into some furniture. (Dep. Colosky 65). Plaintiff fell on his left side, and the two officers

then attempted to secure Plaintiffs' arms to place handcuffs on him. (Dep. Colosky 67-68).

While Plaintiff was on the ground on his left side, Officer Colosky stated that Plaintiff attempted

to elbow the officers, hitting them in the hands and arms as they were trying to handcuff

Plaintiff. (Dep. Colosky 68). In order to subdue Plaintiff to be handcuffed, Detective Rust then

applied pepper spray to Plaintiff. (Dep. Colosky 71). After the application of the pepper spray,

Plaintiff complied, and Officer Colosky took Plaintiff outside to alleviate the symptoms of the

pepper spray. (Dep. Colosky 75). Officer Colosky did not recall Officer Salter being involved in

Plaintiff's arrest. (Dep. Colosky 69).

Defendant Detective Scott Rust testified after being ordered down to the ground, Plaintiff

fell to his knees and raised his arms in the air but "not all the way up." (Dep. Rust 32). He later

stated that Plaintiff had his arms in an "aggressive stance" and in a "boxer's position." (Dep.

Rust 38). At that point, Detective Rust determined that Plaintiff was complying. (Dep. Rust 32-33). Officer Colosky and Detective Rust then approached Plaintiff at the same time. (Dep. Rust 33). When Plaintiff refused the officers' orders to lay prone, Officer Colosky took Plaintiff's right arm, while Detective Rust took the left. (Dep. Rust 35). Detective Rust stated that the original plan was to bring Plaintiff forward, but Plaintiff went backwards and all three ended up on the floor. (Dep. Rust 35-36). While on the ground, Plaintiff, on his side, began to flail one elbow towards the officers. (Dep. Rust 41-42). When on the ground, Plaintiff stopped using his elbow. (Dep. Rust 42). Detective Rust also admitted that he used a pressure point defensive tactic. (Dep. Rust 43). He also testified that Officer Salter appeared at the very end to assist the arrest. (*Id*.).

Officer Salter testified that when he encountered Plaintiff Derek Watson, he was already on the ground on his stomach with Officer Colosky and Detective Rust. (Dep. Salter 19). Officer Salter stated that he assisted in the handcuffing of Plaintiff by grabbing Plaintiff's right arm and pulling it behind his back. (*Id*.). Plaintiff's arms were "tucked under" Plaintiff's body. (Dep. Salter 34, 36). Officer Salter did not see either officer strike Plaintiff. (Dep. Salter 37).

Plaintiff Dawn Wilson testified that while on the ground after being subdued by Officer Rhind, she observed that when Plaintiff Derek Watson emerged from the kitchen, he fell to his knees and put his hands above his head. (Dep. Dawn Watson 32). She stated further that she observed at least five officers approached Plaintiff yelling "Get down. Get down. Get down, motherf***er," and Derek Watson responded, "I'm down. I'm down." (Dep. Dawn Watson 33). She further indicated that Derek Watson attempted to cover his head to protect himself. (*Id*.). Dawn Wilson testified that she did not actually observe any officer strike or kick Derek Watson during the officers' attempt to get him to lay prone on the ground.

Q:      Did you see any officers strike Derek with an object to the back of the head?

A:      No, I didn't see it. I heard it.

Q:      What did you hear?

A:      It was just a sickening thud sound and I heard him make a sound of pain.

Q:      What were you looking at when you heard the noise?

A:      The group of cops all over him.

Q:      Where was Derek, what position was he in?

A:      Then he was down. It was right after he did the arm thing, he was kind of crouched down.

Q:      What arm thing?

A:      Where he tried to swipe the foot away from him. So he was down like that.

Q:      Did you see the officer that you say tried to – that Derek said tried to kick him?

A:      Did I see who did it?

Q:      Correct.

A:      No.

Q:      Did you see the kick?

A:      No.

Q:      What were you looking at at that moment?

A:      The group of guys all over him, I couldn't believe what was going on.

Q:      How was it that you didn't observe a kick then? I just – I can't picture –

A:      They were all clustered together. You can't see everything that's going on when you got a bunch of people clustered together.

.          .          .          .

Q:      How many people were involved in handcuffing him?

A:      There was, like I said, there was at least five of them around him.

Q:      You said you saw that many people around him. I'm asking how many people did you see actually strike him?

A:      They were all on top of him. So I'm sure they all got their licks in.

Q:      But you're speculating there if you say, "I'm sure." My question is, how many people did you actually observe strike him?

A:      I can't say how many struck him. I can't – I mean, there was hands and legs everywhere so I can't –

(Dep. Dawn Watson 34-35, 37). Dawn Wilson further stated that she observed the officers using pepper spray on Plaintiff, but it is unclear whether that was before or after Plaintiff had been handcuffed. (Dep. Dawn Wilson 36-37).

Finally, Officer Cook, the sixth officer through the door of Plaintiffs' residence, testified that he had no contact with Plaintiff Derek Watson during the execution of the search warrant.

21

(Dep. Cook 26-27). Plaintiffs offer no viable theory of liability to implicate Defendant Cook in their § 1983 claim. Therefore, the Court GRANTS Defendant Cook's Motion for Summary Judgment..

From the above testimony, taking the evidence in the light most favorable to Plaintiff, the Court can find a genuine issue of material fact as to whether the officers used more force than was reasonable to subdue Plaintiff Derek Watson. In particular, there is a genuine issue of fact whether the Officers Colosky, Rust, and Salter (1) employed more force than reasonable to subdue Plaintiff and (2) used the pepper spray after Plaintiff was handcuffed. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902-03 (6th Cir. 2004) (holding that it is clearly established that using pepper spray against an individual after he has been handcuffed and hobbled was excessive force). Since there is a genuine factual dispute as to these issues, qualified immunity would not protect the officers in this instance. *Lavado v. Keohane*, 992 F.2d 601, 611 (6th Cir. 1993).

III.   **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** summary judgment on the § 1983 excessive force claim as to:

(1)   Troy Bonadurer
(2)   Christopher Rhind
(3)   Tim Cook
(4)   Don Urban

The Court **DENIES** summary judgment on the § 1983 excessive force claim as to:

(1)   Steven Colosky
(2)   Scott Rust
(3)   Kevin Salter

SO ORDERED.

22

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  January 24, 2007

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on January 24, 2007.

S/Denise Goodine
Case Manager

23